In the Matter of RONALD B. (ANONYMOUS), Appellant.

Second Department, January 30, 1978

### APPEARANCES OF COUNSEL

*William E. Hellerstein* and *Charles Schinitsky (Barbara H. Dildine* and *Mark Kleiman* of counsel), for appellant.

*W. Bernard Richland, Corporation Counsel (Leonard Koerner* and *L. Kevin Sheridan* of counsel), for respondent.

### OPINION OF THE COURT

LATHAM, J.

The incident giving rise to the finding of juvenile delinquency occurred on January 27, 1976, when Ronald B., a 14-

year-old boy, was enrolled in a public school in Queens. Sometime during that day, Gary Simmons, a school official was conversing with Ronald in the hallway of the school. Another school official, Richard Salter, came over to Ronald and told him that he had been informed that Ronald had a gun. Ronald denied it and refused to allow Salter to search him. While Ronald was talking to him, Salter noticed that Ronald's right hand was in his pocket. He asked him to withdraw it. At first Ronald ignored the request, then made a sudden movement to take his hand out of his pocket. Both Salter and Simmons grabbed his arm and withdrew it slowly from the pocket. Ronald was holding a .32 caliber pistol. Salter called the police and the gun was confiscated. A ballistics test showed that the gun was operable.

A hearing was held in the Family Court to determine whether Ronald was a juvenile delinquent. At the hearing, Ronald's attorney raised two points which are now before this court. The first raises the issue whether the seizure of the gun should be suppressed because it was allegedly based on an unconstitutional search. The second questions the admissibility into evidence of the ballistics report without requiring the testimony of the police officer who conducted the test. The Family Court resolved both issues contrary to the position of the appellant. We agree and therefore affirm.

The Court of Appeals, in *People v Scott D.* (34 NY2d 483), held that students are protected from unreasonable searches and seizures by agents of the State, whether they are school officials or police officers. Appellant erroneously contends that *Scott D.* holds that a search in a school by a teacher should be equated to a search by a policeman in the street, and that it must be based on probable cause. Appellant's interpretation indicates his misunderstanding of the holding in the *Scott D.* case. That case does not require that a search by a school official be based on the same standard applicable to a police officer, i.e., probably cause.

The Fourth Amendment of the United States Constitution requires only that searches be "reasonable" (see *People v Peters,* 18 NY2d 238). A school official may have a reasonable suspicion that a dangerous situation exists, and may act on that suspicion. "A school is a special kind of place in which serious and dangerous wrongdoing is intolerable. Youngsters in a school, for their own sake, as well as that of their age peers in the school, may not be treated with the same circum-

spection required outside the school or to which self-sufficient adults are entitled" *(People v Scott D.,* 34 NY2d 483, 486-487, *supra).*

Officials in a school act *in loco parentis.* Although this concept is limited, it does allow school personnel to exercise such powers of control, restraint and correction over pupils as is reasonably necessary to facilitate the educational functions of a school. The doctrine is embedded in common law and has recently been enunciated by the decision of the Supreme Court of the United States in *Ingraham v Wright* (430 US 651), which upheld a teacher's right to discipline children by use of corporal punishment. The Supreme Court held (p 682): " '[T]he court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.' *Tinker v Des Moines School Dist.,* 393 U.S. 503, 507". A balance must always be reached between protecting personal rights and safeguarding the security of all of the students. *Scott D.* sets forth some factors to consider in determining the reasonableness of a school search. These factors include "the child's age, history and record in the school, the prevalence and seriousness of the problem in the school to which the search was directed, and, of course, the exigency to make the search without delay." (34 NY2d, at p 489.)

In the case now before us, we are dealing with a 14-year-old boy, in a school, with a loaded weapon in his pocket. There is no doubt in our minds that a school official has the right to "frisk" a child based on a reasonable suspicion that he has a gun. Police officers are given that same standard when searching adults for guns (see CPL 140.50). It would be absurd to have a higher standard for those with a quasi-parental obligation than for police officers who approach an adult on the street. The mere fact that a child may have a loaded gun in a school creates exigencies affecting the security of all of the children in the school (cf. *People v Taggart,* 20 NY2d 335).

Furthermore, the officials in this case did not in fact search Ronald. When he made a suspicious movement, they merely grabbed his hand and found a gun in it. If, however, they had frisked him, their action would still have been reasonable under the circumstances. The primary purpose of school searches is to protect the school environment. What is not allowed are unjustified random searches that may psychologi-

cally harm a child. However, a "school official, standing *in loco parentis* to the children entrusted to his care, has, *inter alia,* the long-honored obligation to protect them while in his charge, so far as possible, from harmful and dangerous influences" *(People v Jackson,* 65 Misc 2d 908, 910, affd 30 NY2d 734). Salter and Simmons, without regard to their own safety, fulfilled this obligation when they questioned Ronald, found the gun and confiscated it. The Law Guardian, apparently, believes that the hands of school officials should be tied when dealing with unfortunate children caught in criminal activity at young ages. We cannot sanction such a legal doctrine.

Additionally, an issue has been raised concerning the ballistics report prepared by the police department. Appellant argues that a ballistics report cannot be admitted under the business records exception to the hearsay rule and that, therefore, the person who prepared the report must testify. This exception to the hearsay rule is set forth in CPLR 4518, which provides, in subdivision (a) thereof: "Any writing or record, whether in the form of an entry in a book or otherwise, made as memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of that act, transaction, occurrence or event, if the judge finds that it was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. All other circumstances of the making of the memorandum or record, including lack of personal knowledge by the maker, may be proved to affect its weight, but they shall not affect its admissibility. The term business includes a business, profession, occupation and calling of every kind."

Appellant does not question the reliability of the ballistics report, but asserts that the test was specifically made for the purpose of litigation and thus does not fall within the business records exception, citing *Palmer v Hoffman* (318 US 109). In *Palmer,* the Supreme Court held that an accident report prepared by the railway engineer involved in the accident was not admissible. It reasoned that an accident report is not a part of the systematic conduct of running the business of a railroad.

A ballistics report, however, does further the business of the police department. It is not prepared solely for litigation, but

is a routine test conducted on almost all of the guns confiscated by the police and may, in fact, defeat litigation if the gun is found to be inoperable. It is a simple test which can be performed by any police officer and consists mainly of pulling the trigger.

The Court of Appeals has held various reports, involving tests more complicated than a ballistics test, admissible as an exception under the business records rule. It specifically found autopsy reports prepared by a medical examiner to determine cause of death admissible because "they were contained in a report filed in a public office by a public officer for a public purpose embodying facts required by statute to be stated therein" (People v Nisonoff, 293 NY 597, 604). In People v Magri (3 NY2d 562, 566), the Court of Appeals held that radar tests also fit within this exception. In dicta, the court indicated that ballistics tests would be included because of their general reliability stating: "and *ballistic evidence,* among a variety of kindred scientific methods, are freely accepted in our courts for their general reliability, without the necessity of offering expert testimony as to the scientific principles underlying them. The use of radar for speed detection may now be said to fall in this category." (Emphasis supplied.) In People v Foster (27 NY2d 47), the Court of Appeals found a speedometer deviation record admissible as encompassed by the hearsay exception. The court stated that reports prepared solely for litigation are inadmissible, but (p 52) "if there are other business reasons which require the records to be made, they should be admissible." Part of the business of the police is litigation (detection and bringing to trial alleged criminals) and a test in furtherance of that purpose or to determine criminal activity, if reliable, should be allowed into evidence without requiring expert testimony.

Thus, Family Court was correct in its rulings involving the admissibility of the gun and the ballistics report, and properly found that appellant was a juvenile delinquent.

HOPKINS, J. P., DAMIANI and COHALAN, JJ., concur.

Order of the Family Court, Kings County, dated September 1, 1977, affirmed, without costs or disbursements.